**G. M. LEASING CORP.,**
**Plaintiff-Appellee,**

v.

**The UNITED STATES of America et al., Defendants-Appellants,**

**George I. Norman, III, Intervenor.**

**No. 74–1436.**

United States Court of Appeals,
Tenth Circuit.

Submitted Jan. 24, 1975.

Decided May 1, 1975.

Rehearing Denied June 17, 1975.

---

936

Murray S. Horwitz, Tax Div. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Murray S. Horwitz, Attys., Tax Div., Dept. of Justice), Washington, D. C., for defendants-appellants.

Richard J. Leedy, Salt Lake City, Utah, for plaintiff-appellee.

Before HILL, SETH and BARRETT, Circuit Judges.

HILL, Circuit Judge.

This appeal results from an allegedly wrongful levy and seizure by Internal Revenue Service agents of a corporation's assets to satisfy the income tax liability of an individual taxpayer.

Appellants are the United States, Department of the Treasury, Internal Revenue Service (IRS), and a district director and several agents of the IRS. Appellee G. M. Leasing Corp. is a Utah corporation allegedly engaged in a luxury car leasing business in Salt Lake City, Utah.

The controversy centers around the income tax liability of George I. Norman, Jr. (taxpayer), a fugitive from justice.[1] He neglected to file a 1970 or a 1971 federal income tax return. Subsequently, in October, 1972, IRS agent Philip Clayton was assigned to investigate taxpayer's possible income tax liability.

---

1. Taxpayer became a fugitive from justice after being convicted of violating 18 U.S.C. §§ 656 and 2. *See* United States v. Cooper, 464 F.2d 648 (10th Cir. 1972).

Clayton received no information or cooperation from taxpayer and necessarily had to base any income tax deficiency upon an examination of third party records. This investigation resulted in deficiency assessments against taxpayer and his wife on March 19, 1973, in the respective amounts of $951,409.93 and $154,138.54. Jeopardy assessments were issued the next day and IRS agents went to taxpayer's residence in Salt Lake City, Utah, to collect the tax. They informed taxpayer's wife of the jeopardy assessments and made a demand for the tax due. She refused and the agents left. Federal tax liens were filed and levies were placed on taxpayer's bank account.

While at taxpayer's residence the IRS agents had observed several automobiles in taxpayer's driveway. A subsequent check with the state motor vehicle department revealed that these automobiles were registered to appellee and another corporation organized and controlled by taxpayer, and that taxpayer owned no automobiles. After further investigation it was determined that appellee was taxpayer's alter ego or transferee and that its assets should be seized to satisfy taxpayer's tax liability.

On March 21, 1973, the IRS agents went to appellee's premises to seize assets. This was also the location of taxpayer's other offices and was owned by one of taxpayer's other corporations. Additionally, taxpayer's son, George I. Norman, III (intervenor), was using the premises as a personal residence. With the aid of locksmiths, the agents succeeded in gaining entry into the building. At this point intervenor arrived on the scene and asked what the agents were doing. They told him that they were contemplating seizing assets, and they entered the building. They left a short time later without seizing anything, being unsure as to whether the building was a personal residence or a business office.

The agents returned to appellee's premises on March 23, 1973, to seize assets and documents. They again used locksmiths to gain entry. They seized, inter alia, documents and placed them in boxes, which were loaded on a moving van. It was thought that the documents might be, or could indicate the location of, money and stock certificates. These documents were photocopied and the originals were subsequently returned to appellee. The agents also seized appellee's bank account and automobiles. Subsequently, they determined that intervenor was taxpayer's alter ego and seized 7,143 shares of Emdeko stock in intervenor's name.

On May 3, 1973, appellee filed suit against appellants in the United States District Court for the District of Utah. A second amended complaint, filed on October 17, 1973, alleged, inter alia, that the jeopardy assessments were arbitrary, capricious and without foundation; that the determination that appellee was taxpayer's alter ego was arbitrary and capricious; that IRS agents illegally entered appellee's office, thus violating appellee's and taxpayer's constitutional right of privacy; and, that IRS agents conducted an illegal search and seizure of appellee's premises.

The complaint requested, as relief, the return or destruction of the photocopies of the documents seized; return of the automobiles levied on and seized; suppression of evidence obtained from the seized documents and an order barring appellants from ever again obtaining such evidence by any means; suppression of the seizure of the automobiles as evidence and an order barring appellants from ever again seizing said automobiles; release of all levies filed by appellants against appellee's property; and, $525,000 damages for appellants' violation of appellee's constitutional rights.

Intervenor's motion for intervention was granted and he filed a complaint alleging that he was the owner of the Emdeko stock seized by the IRS agents. The complaint requested a determination that intervenor was not taxpayer's alter ego, return of the stock, and money damages in an undetermined amount.

Appellants answered on November 1, 1973, and also counterclaimed for foreclosure of its tax liens. After a nonjury trial the trial court entered findings of fact and conclusions of law, including the following: appellee was not taxpayer's alter ego; the seizure of appellee's assets and documents constituted an illegal search and seizure; appellant Clayton maliciously participated in the search and seizure of appellee's premises; the assessments against taxpayer and his wife for 1970 and 1971 were erroneous and they have no liability for federal income tax for those years; and intervenor was the owner of 7,000 shares of Emdeko stock but was taxpayer's alter ego with respect to 143 shares thereof.

The trial court entered judgment for appellee and intervenor on May 24, 1974. The judgment (1) gave appellee and intervenor money damages in an undetermined amount against the individual IRS agents; (2) gave appellee and intervenor punitive damages in an undetermined amount against appellant Clayton; (3) suppressed any use of the seized documents or photostats thereof; (4) dismissed appellants' counterclaim with prejudice; (5) ordered the return to appellee and intervenor of all seized assets; (6) ordered the return of 7,000 shares of Emdeko stock to intervenor and the return of 143 shares of Emdeko stock to taxpayer, his wife, "or any other rightful claimant"; (7) removed all levies and liens against said assets; and (8) gave appellee an undetermined amount of money damages for assets disposed of by appellants.

Appellants first challenge the trial court's finding that appellee was not taxpayer's alter ego. This finding is presumptively correct and must be left undisturbed on appeal unless it is clearly erroneous. *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1974). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *See, e. g.*, *Kelson v. United States*, 503 F.2d 1291 (10th Cir.

1974); *Clancy v. First Nat'l Bank*, 408 F.2d 899 (10th Cir. 1969), cert. den'd, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422.

We are convinced that the trial court's alter ego finding is, as appellants contend, clearly erroneous. The evidence overwhelmingly indicates that appellee had no separate or independent existence and that it was taxpayer's alter ego. Appellee was one of four corporations whose existence was initiated by taxpayer. He was not an incorporator, director or officer of appellee, but served only as its general manager. He nevertheless exerted substantial, if not exclusive, control over appellee.

Although appellee had three directors they were nothing more than figureheads. They made no business decisions, had no duties, attended no directors meetings, and were paid no salaries. One of the directors was taxpayer's part-time secretary. She became an incorporator-director at taxpayer's request but was not told what duties and responsibilities these positions would involve and was not informed of the nature of appellee's business. She did not participate in running the affairs of appellee except to write a check when told to do so by taxpayer. She continued to work as taxpayer's secretary while serving as a director and, although she is not presently associated with appellee, never officially terminated her position.

Another incorporator-director, the attorney who prepared the legal work for appellee's incorporation, testified that appellee was merely a shell or alter ego of taxpayer and that "it had no assets or property of its own." He also testified that certain people acted as officers of appellee in connection with one or two transactions but that appellee actually had no officers. A third director, who also was a director of taxpayer's other corporations, testified that taxpayer controlled the affairs of the corporation "along with discussion of other people."

Taxpayer's dealings with appellee's assets is another factor indicating appellee had no separate existence. Some of appellee's assets, luxury automobiles worth

thousands of dollars each, were owned by taxpayer and transferred to appellee. There is no evidence in the record that these transfers were for consideration. The record does suggest that appellee did not have sufficient, if any, funds to acquire these assets. Moreover, the record discloses that these automobiles were not transferred to appellee until several months after its incorporation. One of taxpayer's employees, whose duties included such things as taking care of these luxury automobiles for taxpayer, testified that taxpayer used the automobiles in his individual business and that they were part of his advertising campaign.

The record also indicates that taxpayer purchased a new Jaguar in appellee's name and paid for it with a check drawn on appellee's bank account, but that taxpayer's wife used the car as her personal vehicle. And, a gas station that stored some of appellee's luxury automobiles for taxpayer was paid by checks drawn on ·Commercial Properties, another of taxpayer's corporations, with only a couple of bills being paid by appellee.

Other evidence indicating that appellee is taxpayer's alter ego is the fact that appellee was supposedly engaged in the automobile leasing business but that it leased no automobiles; it had no employees, paid no wages, paid no state sales or use tax, issued no stock and had no stockholders' meetings. Appellee contends that stock was issued but has presented no stock certificates, minutes of stockholders' meetings or other documentary evidence to substantiate its allegations.

■ Based upon this evidence we think it is clear that appellee was taxpayer's alter ego. Accordingly, we must hold that the trial court's finding to the contrary was error.

■ Relying on Rule 52,˙ F.R.Civ.P.,[2] appellants next contend the trial court erred because it entered no independent findings of fact or conclusions of law but merely accepted those prepared by appellee. We agree. This practice of the same trial judge has been twice condemned. See United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); Kelson v. United States, *supra.* "The mechanical adoption of a litigant's findings is an abandonment of the duty imposed on trial judges by Rule 52, F.R.Civ.P., because findings so made fail to 'reveal the discerning line for decision . . ..'" Kelson v. United States, *supra* at 1294.

Appellants next contend that the trial court erred in holding that appellee's documents and automobiles were illegally seized, and in ordering the return of the automobiles and the suppression of the documents. Again, we agree.

■ Part of the basis for the trial court's ruling in this regard appears to

---

2. Rule 52, F.R.Civ.P., provides:

"(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58, and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds for its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of, a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b). ·

"(b) Amendment. Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment."

be a finding that appellant Clayton's participation in the search and seizure was of a malicious character. There is no evidence in the record to support this finding, and we must hold that it is clearly erroneous.

 It is clear from the record that appellants conducted a statutorily valid levy rather than an illegal search and seizure. A jeopardy assessment was made on March 19, 1973. Notice and demand for immediate payment were made the following day, as authorized by 26 U.S.C. § 6331(a).[3] The refusal to pay authorized appellants to collect the tax by levy, and this included the power of "seizure by any means."[4] Thus appellants were acting pursuant to statute and did not commit an illegal search. The trial court's order returning the assets and suppressing the documents is improper.

Appellants next contend that the trial court erred in voiding the tax assessments and in dismissing their lien foreclosure counterclaim. Appellee, on the other hand, contends the trial court's actions were proper because the unrebutted evidence showed that the assessments were erroneous.

 When the government undertook to prove its counterclaim, it offered into evidence documents showing a presumptively correct tax assessment[5] and thereby established a prima facie case of liability. See, e. g., Psaty v. United States, 442 F.2d 1154 (3rd Cir. 1971); Adams v. United States, 358 F.2d 986, 175 Ct.Cl. 288 (1966); 9 Mertens L.Fed. Income Tax. § 49.218 (Zimmet rev. 1971). This placed upon appellee the burden of going forward with the evidence and the burden of ultimate persuasion. See, e. g., United States v. Rexach, 482 F.2d 10 (1st Cir. 1973), cert. den'd, 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330.

Appellee contends it met this burden of proof by showing that the assessment was erroneous in that it (1) did not give taxpayer credit for $289,800 which taxpayer paid; (2) gave taxpayer no credit for business expenses; (3) gave taxpayer a zero basis in some stock; and (4) included as income a $115,000 stock sale which was not a sale. Appellee contends this evidence shifted the burden of proof back to appellants to show what deficiency, if any, existed and that appellants failed to prove any deficiency. We disagree.

 The fact that taxpayer's assessment was not lessened by business expenses does not vitiate the assessment. The burden of proof to establish a deduction and the amount thereof is upon the taxpayer. Bishop v. CIR, 342 F.2d 757 (6th Cir. 1965). Here, taxpayer is not a party to the proceedings and he did not supply the IRS with any evidence of a business expense or with any documentation to substantiate a claim for a business expense deduction. Since no deduction was established the assessment's failure to reflect such a deduction was proper.

 Nor does the fact that taxpayer was given a zero basis in some stock make the assessment erroneous. A taxpayer bears the burden of proving the cost or other basis of property. If he fails to do this the basis of such property is deemed to be zero. See, e. g., Factor v. CIR, 281 F.2d 100 (9th Cir. 1960), cert. den'd, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365.

---

3. 26 U.S.C. § 6331(a) provides in part:

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax . . .. If the Secretary or his delegate makes a finding that the collection of such tax is in jeopardy, notice and demand for immediate payment of such tax may be made by the Secretary or his delegate and, upon failure or refusal to pay such tax, collection thereof by levy shall be lawful without regard to the 10-day period provided in this section."

4. 26 U.S.C. § 6331(b) provides in part:

"The term 'levy' used in this title includes the power of distraint and seizure by any means."

5. These documents were Defendants Exhibit 8, Notice of Federal Tax Lien Under Internal Revenue Laws, and Defendants Exhibit 10, Levy. We also consider Defendants Exhibit 11, Certificate of Assessments and Payments. The trial court refused to admit this document into evidence. We find no valid basis for excluding it and believe it should have been admitted.

Appellee also asserts that the assessment was erroneous because it was not lessened or offset by a $289,800 payment made by taxpayer. This payment was attached to an estimated tax return and sent to the IRS on November 15, 1971, before any investigation of tax liability had been conducted or any assessment made. The money was placed in a suspense account to be applied against the assessment. In accordance with IRS policy this money could not, at the time the assessment was being made, be applied as an offset or credit. The record discloses that taxpayer's account was subsequently credited with this payment. This method of handling a payment did not make the assessment erroneous.

Appellants concede that the assessment included $115,000 of income that was not income, and appellee contends this error vitiates the entire assessment. We are not persuaded that it does. Merely showing an inaccuracy in one item in the deficiency determination does not defeat the presumption of correctness in favor of the Commissioner with respect to the entire deficiency. *See, e. g.*, Foster v. CIR, 391 F.2d 727 (4th Cir. 1968).

Appellee, then, has not proven the assessment to be erroneous. Under these circumstances the trial court erred in voiding the assessment and not decreeing the requested foreclosure of the lien upon the property lawfully seized.

The final issue concerns the disposition of certain stock. Appellants levied on 7,143 shares of Emdeko stock, of which intervenor claimed to be the owner. The trial court found that 7,000 shares of this stock belonged to intervenor and ordered it returned to him. However, it found that intervenor was taxpayer's alter ego with respect to the remaining 143 shares of stock, and it ordered these shares returned to taxpayer, his wife, or any other rightful claimant.

Appellants do not contest the trial court's determination of the 7,000 shares but they do contend that the remaining 143 shares should not be returned to taxpayer. We agree. Appellants seized the stock as part of its levy on taxpayer's property. The trial court should have allowed appellants to keep the 143 shares, which it found were owned by taxpayer, to satisfy taxpayer's tax liability.

In sum, we affirm the trial court's judgment insofar as it orders the 7,000 shares of Emdeko stock returned to intervenor. We reverse the judgment insofar as it (1) awards appellee and intervenor money damages against all appellants; (2) awards appellee and intervenor punitive damages against appellant Clayton; (3) orders the destruction of the books and records in the possession of appellants; (4) orders that any use of photostats of said books and records is illegal; (5) dismisses appellants' counterclaim; (6) orders appellants to return all seized assets to appellee and intervenor; (7) removes all levies and liens against said assets; and (8) awards appellee judgment for the value of two automobiles disposed of by appellants. We also conclude, as a matter of law, that at the time of the seizure the government had a valid existing lien upon all of the property involved herein in an amount in excess of the value of the property seized. Judgment will be entered accordingly.